UNITED STATES BANKRUTPCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

| | |
|---|---|
| In re: | : |
| | : Chapter 11 |
| Old DDUS, Inc., *et al.*, | : Case No. 20-10916 (MEW) |
| | : |
| Debtors. | : |

------------------------------------------------------------x

| | |
|---|---|
| ANTHONY MILAZZO, solely in his capacity | : |
| As Creditor Trustee of the OLD DDUS | : |
| CREDITOR TRUST, | : |
| | : |
| Plaintiff, | : Adv. Pro No. 22-01143 (MEW) |
| | : |
| v. | : |
| | : |
| SORAPOJ TECHAKRAISRI, | : |
| | : |
| Defendant. | : |

------------------------------------------------------------x

## DECISION ON MOTION FOR DEFAULT JUDGMENT

A P P E A R A N C E S :

ARENTFOX SHIFF LLP
New York, NY and Boston, MA
*Attorneys for Plaintiff Anthony Milazzo, Esq., as*
*Creditor Trustee of the Old DDUS Creditor Trust*
   By: Justin A. Kesselman, Esq.
       George P. Angelich, Esq.

**HONORABLE MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

     Anthony Milazzo is the trustee (the "**Trustee**") of the Old DDUS Creditor Trust (the

"**Creditor Trust**"), which is an entity that was established under the plan of reorganization (the

"**Plan**") that I confirmed on November 25, 2020 in the chapter 11 cases involving the company

that was then known as Dean & Deluca New York, Inc. and various of its affiliates. The Plan

provided for the tentative settlement of claims against the Debtors' Chief Executive Officer, Mr.

Sorapoj Techakraisri, arising out of his pre-bankruptcy conduct and control of the Debtors.  Mr.
Techakraisri agreed to provide a sworn and truthful personal statement of assets and liabilities and
to pay a total of $1 million to the Creditor Trust in various installments, and upon completing those
payments he was to be released from all claims that could have been asserted against him.
However, the Plan provided that if full payments were not timely made there would be no such
release, and instead the Creditor Trust would have the right to assert all claims that the Debtors
could have asserted against Mr. Techakraisri.  The Plan included a court-approved assignment of
claims for that purpose.  The Creditor Trust agreed to defer prosecution for so long as no default
existed, and Mr. Techakraisri agreed that the statute of limitations would be tolled unless and until
such time as the Creditor Trust gave written notice of the occurrence of a default.  In addition, the
Plan provided that a default (and the Creditor Trust's pursuit of other claims) would not release
Mr. Techakraisri from his obligations to pay $1 million to the Creditor Trust; instead, any amounts
recovered from the assertion of post-default claims would be first credited against "the outstanding
balance of the Techakraisri Payment." *See* Plan, ECF No. 445,[1] ¶¶ I(A)(10), I(A)(34), ¶ I(A)(139)–
(142), IV(D)(5)(d), and IV(F)(7).

Mr. Techakraisri did not make the final $750,000 payment that was due in early 2022.  His
counsel appeared at a status conference in the chapter 11 cases on February 22, 2022 and
acknowledged that Mr. Techakraisri was in default of his obligations, while contending that Mr.
Techakraisri did not have the ability to make the payment.

On September 1, 2022, the Trustee filed this adversary proceeding against Mr.
Techakraisri.  Count One of the Complaint asks for the entry of judgment in the amount of

---

[1]    Citations to items on the consolidated chapter 11 docket are to "ECF No. __."  Citations to
items on the docket for this adversary proceeding are to "AP ECF No. __."

$750,000 plus interest and other damages, representing (a) the unpaid amount that Mr. Techakraisri agreed to pay pursuant to the Plan, and (b) $8,621 of expenses that the Trustee incurred allegedly as the result of Mr. Techakraisri's false financial statement. Count Two seeks the entry of a contempt judgment that would (a) order the payment of the balance of Mr. Techakraisri's payment obligation, (b) impose daily penalties for continued non-payment, and (c) award attorneys' fees in favor of the Trustee. Count Three seeks judgment in the amount of $1,479,806 pursuant to Mr. Techakraisri's promise to Grovepark International Ltd. ("**Grovepark**") that Mr. Techakraisri would repay a portion of a loan that Grovepark had received from Debtor Dean & Deluca, Inc. Counts Four and Five seek the entry of judgment in the amount of approximately $30 million, representing damages for alleged breaches of fiduciary duty. Counts Six and Seven seek the entry of judgment in the amount of $2,600,000, representing the amount of a receivable that allegedly was fraudulently transferred by the Debtors to Mr. Techakraisri. The Trustee also seeks prejudgment interest on each damage claim.

Mr. Techakraisri did not file an answer or other response to the Complaint, and the Trustee moved for the entry of a default judgment on June 6, 2023. AP ECF No. 9. Although they have not entered a formal appearance in the adversary proceeding, it is quite plain that Mr. Techakraisri and his counsel are aware of the Complaint and of the relief sought in these proceedings. William R. Baldiga of Brown Rudnick LLP – the firm which had formerly represented the Debtors – entered an appearance as new counsel to Mr. Techakraisri in the chapter 11 cases on May 28, 2021. ECF Nos. 519, 520. As noted above, Mr. Baldiga appeared at a status conference in the chapter 11 case on February 16, 2022, the purpose of which was to discuss the status of Mr. Techakraisri's performance of his obligations under the Plan. ECF No. 590. Mr. Baldiga also participated by telephone in a status conference that was held on August 10, 2023 to discuss the motion for entry

3

of a default judgment in this adversary proceeding. *See* Transcript, AP ECF No. 10. At that time, Mr. Baldiga confirmed that he represented Mr. Techakraisri, but stated that "we have not appeared in this adversary proceeding" because it was Mr. Techakraisri's position that "service has not yet been made." *Id.* at 4. Mr. Baldiga nevertheless confirmed on the record that "there is no defense on the merits as to the $750,000 that was not paid when due." *Id.* at 5–6.

Notwithstanding his default, Mr. Techakraisri had the right to oppose the entry of a default judgment and to appear and participate in the default judgment hearings. After the end of the August 10, 2023 status conference, I issued an Order that set a deadline for any response by Mr. Techakraisri to the motion for entry of a default judgment and that scheduled an evidentiary hearing for September 27, 2023, which was later adjourned to October 18, 2023. AP ECF Nos. 19, 25. However, Mr. Techakraisri did not file any papers, and he and Mr. Baldiga elected not to participate in the October 18th hearing. I made some tentative rulings on October 18th, and then adjourned the hearing pending the potential submission of additional evidence. AP ECF No. 29. Mr. Baldiga and Mr. Techakraisri were given notice of the adjournment, AP ECF No. 31, but they again elected not to participate.

At the hearings on October 18, 2023 and December 5, 2023 I admitted into evidence the Declarations of Alongkorn Tongmee, Alyssa Fiorentino, Anthony Milazzo, and John P. Madden, as well as a number of Exhibits. I also took judicial notice of the docket entries in the above-captioned Chapter 11 Cases and Adversary Proceeding that are described herein.

The Trustee's motion for entry of a default judgment raised some unusual issues. This Decision sets forth the Court's final rulings on those issues.

## <u>Considerations that Govern the Entry of a Default Judgment</u>

A party's default does not automatically result in the entry of judgment. Instead, the applicable rules and case law have identified a number of determinations that must be made by the trial court. In addition, the trial court has discretion to inquire into additional matters.

<u>First</u>, a federal court must satisfy itself that it has subject matter jurisdiction over any matter that is presented to it. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (holding that federal courts have an independent obligation to inquire into the existence of subject-matter jurisdiction). This is an obligation that is not waived by a defendant's failure to appear or by a defendant's failure to raise a defense. *See Mansfield, Coldwater 7 Lake Michigan Ry. v. Swan*, 111 U.S. 379, 382 (1884) (holding that a court must dismiss a case for lack of subject matter jurisdiction even if parties fail to raise the issue); *Mitchell v. Maurer*, 293 U.S. 237, 243 (1934) (stating that subject matter jurisdiction cannot be waived); *Letelier v. Republic of Chile*, 488 F. Supp. 665, 668 (D.D.C. 1980) (holding that issue of subject matter jurisdiction should be fully explored despite previous entry of default); Fed. R. Civ. P. 12(h)(3) ("Whenever it appears by suggestion of the parties *or* otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.")

<u>Second</u>, a trial court may (and often should) consider whether it has personal jurisdiction over the defaulting defendant. Many Circuit Courts of Appeal have held that a trial court is required to make such a determination, but the Second Circuit Court of Appeals has left open the question of whether a court "must" do so. *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 133 (2d Cir. 2011) (collecting cases). Nevertheless, it is clear in this Circuit that a trial court "may" investigate its personal jurisdiction before entering a default judgment. *Id.*; *see also Flextronics Da Amazonia Ltda. v. CRW Plastics USA, Inc.*, 2023 U.S. App. LEXIS 31634, at *6 (2d Cir. 2023) ("A district court may raise the issue of personal jurisdiction *sua sponte* before entering a default judgment against an absent defendant."); *Sinoying Logistics PTE Ltd. v. Yi Da*

5

*Xin Trading Corp.*, 619 F.3d 207, 213 (2d Cir. 2010) ("[B]efore a court grants a motion for default judgment, it may first assure itself that it has personal jurisdiction over the defendant."). Conducting such an inquiry is often the better practice, since the defaulting party might attempt to make a collateral attack on a default judgment if personal jurisdiction over the defaulting party has not been properly considered and established. *See Ins. Corp. of Ir., Ltd. v. Compagnie Des Bauxites De Guinee*, 456 U.S. 694, 706 (1982) ("A defendant is always free to ignore the judicial proceedings, risk a default judgment, and then challenge that judgment on jurisdictional grounds in a collateral proceeding."). I have therefore considered and addressed, below, the issues of both personal jurisdiction and subject-matter jurisdiction.

Third, a party who has defaulted is deemed to have admitted the well-pleaded factual allegations in a complaint. *Greyhound Exhibitgroup v. E.L.U.L Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992); *Feltman v. Tri-State Emp. Serv. (In re TS Emp., Inc.)*, 602 B.R. 840, 844–45 (Bankr. S.D.N.Y. 2019). Nevertheless, a court has discretion to conduct hearings to "establish the truth of any allegation by evidence" or to "investigate any other matter" that the court deems relevant to the requested entry of a default judgment. Fed. R. Civ. P. 55(b)(2), made applicable by Fed. R. Bankr. P. 7055; *City of New York*, 645 F.3d at 131–32; *Cement & Concrete Workers Dist. Council Welfare Fund*, 699 F.3d at 234; *Finkel v. Romanowicz*, 577 F.3d 79, 88 (2d Cir. 2009). As indicated below, I elected to require some evidence as to the merits of the underlying claims and I conducted evidentiary hearings for that purpose.

Fourth, although a defaulting party may be deemed to have admitted the factual allegations of a Complaint, conclusions of law are not admitted, and so the legal sufficiency of a claim is not admitted by a default. *Cement & Concrete Workers Dist. Council Welfare Fund v. Metro Found. Contrs. Inc.*, 699 F.3d 230 (2d Cir. 2012). A trial court therefore is "required to determine whether

the facts, as alleged in well-pleaded, non-conclusory fashion, were sufficient to establish the defendant's liability as a matter of law." *E.A. Sween Co. v. A & M Deli Express Inc.*, 787 Fed. Appx. 780, 782 (2d Cir. 2019); *Danser v. Bagir Int'l*, 571 Fed. Appx. 54, 55 (2d Cir. 2014) (same); *TAGC Mgmt., LLC v. Lehman, Lee & Xu Ltd.*, 536 Fed. Appx. 45, 46 (2d Cir. 2013); *City of New York*, 645 F.3d at 137; *Finkel*, 577 F.3d at 84. I have therefore considered, below, the extent to which the well-pleaded allegations of the Complaint state valid causes of action.

<u>Fifth</u>, a default is not considered to be an admission as to the damages to which a plaintiff may be entitled. *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 154–55 (2d Cir. 1999); *Gomez v. 4 Runners, Inc.*, 769 Fed. Appx. 1, 2 (2d Cir. 2019); *Hosking v. New World Mortg., Inc.*, 570 Fed. Appx. 28, 31 (2d Cir. 2014); *Finkel*, 577 F.3d at 83 n.6. A trial court must "conduct an inquiry in order to ascertain the amount of damages with reasonable certainty" before entering a default judgment. *Credit Lyonnais Sec. (USA), Inc.*, 183 F.3d at 154–55; *House v. Kent Worldwide Mach. Works, Inc*., 359 Fed. Appx. 206 (2d Cir. 2010) ("[T]he district court cannot simply rely on the plaintiff's statement of damages; there must be a basis upon which the court may establish damages with reasonable certainty.").

The Second Circuit Court of Appeals has explained that "reasonable certainty" means that the "fact or existence" of damage must be reasonably certain. *Holland Loader Co. LLC v. FLSmidth A/S*, 769 Fed. Appx. 40, 42 (2d Cir. 2019). However, while the *existence* of damage must be clear, less precision is required in demonstrating the *amount* of damage that flowed from particular conduct. *Contemp. Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1977). "The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount." *Story Parchment Co. v. Paterson Parchment Paper*

*Co.*, 282 U.S. 555, 562 (1931). "In most contexts, [the rule of reasonable certainty] is akin to the ordinary preponderance of the evidence standard, which requires only that damages are 'capable of measurement based upon known reliable factors without undue speculation.'" *Methyl Tertiary Butyl Ether Prods. Liab. Litig. v. Exxon Mobil Corp.*, 643 F. Supp. 2d 439, 456–57 (S.D.N.Y. 2009) (*quoting Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 624 N.E.2d 1007, 1010 (N.Y. 1993)). Accordingly, "the fact that . . . damages may be difficult to ascertain does not relieve the district court of its duty to award . . . damages if actual injuries are suffered." *Milburn v. Coughlin*, 83 F. Appx. 378, 380 (2d Cir. 2003).

The determination of damages following a default must be based on admissible evidence, even when a defendant elects not to participate in a hearing and is not present to object. *See, e.g., Cesario v. BNI Constr., Inc.*, No. 07 Civ. 8545, 2008 U.S. Dist. LEXIS 103155, at *2 (S.D.N.Y. Dec. 15, 2008); *Ermenegildo Zenga Corp. v. 56th St. Menswear, Inc.*, No. 06 Civ. 7827, 2008 U.S. Dist. LEXIS 77013, at *3 (S.D.N.Y. Oct. 2, 2008); *Smith v. Islamic Emirate of Afg.*, 262 F. Supp. 2d 217, 224 (S.D.N.Y. 2003)). The court may receive live testimony for this purpose, but it may elect instead to receive evidence in the form of affidavits and documentary exhibits. Fed. R. Civ. P. 55(b)(2); *Cement & Concrete Workers Dist. Council Welfare Fund*, 699 F.3d at 234 (holding that there must be an evidentiary basis for a damage award but that a district court has discretion, in lieu of a hearing, to consider evidence submitted in the form of detailed affidavits and documentary evidence).

Finally, Rule 54(c) of the Federal Rules of Civil Procedure, made applicable here by Bankruptcy Rule 7054, states that a default judgment "must not differ in kind from, or exceed in amount, what is demanded in the pleadings."

## **Subject Matter Jurisdiction**

This Court has jurisdiction over civil proceedings that arise "under" the Bankruptcy Code or that "arise in" or are "related to" cases under the Bankruptcy Code. *See* 28 U.S.C. §§ 157, 1334; Amended Standing Order of Reference from the United States District Court for the Southern District of New York, dated as of January 31, 2012.

### A.    **"Arising Under" Jurisdiction**

Two of the claims asserted in the Complaint (Counts Six and Seven) are claims to undo an alleged fraudulent transfer of a receivable and to recover the value of the property that was transferred. These claims are asserted pursuant to sections 548 and 550 of the Bankruptcy Code. They "arise under" the Bankruptcy Code, and I have subject matter jurisdiction over them.

### B.    **"Arising In" Jurisdiction**

Claims "arise in" a bankruptcy case if they "are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy." *Elliott v. GM LLC (In re Motors Liquidation Co.)*, 829 F.3d 135, 153 (2d Cir.2016) (citing *Baker v. Simpson*, 613 F.3d 346, 351 (2d Cir. 2010)). A court's "arising in" jurisdiction includes, among other things, claims that require the enforcement of orders issued during a bankruptcy case. *See KeyBank Nat'l Ass'n v. Franklin Advisers, Inc.*, 600 B.R. 214, 230 n.14 (S.D.N.Y. 2019) (holding that disputes over a financing agreement arose in a bankruptcy case because the disputes were born from the bankruptcy proceedings and because there would have been no debtor-in-possession financing without the bankruptcy); *Giese v. Cmty. Trust Bank (In re HNRC Dissolution Co.)*, 2015 WL 5299468, at *6 (Bankr. E.D. Ky. Sept. 9, 2015); *Lothian Cassidy LLC v. Ransom*, 428 B.R. 555, 560 (E.D.N.Y. 2010). "Arising in" jurisdiction also encompasses claims that are inextricably tied to conduct that occurred in the bankruptcy court. *See Baker*, 613 F.3d at 350 (holding that malpractice claims that were based on state law, but that were based on conduct in the bankruptcy

court, were "inseparable from the bankruptcy context" and therefore "arose in" the bankruptcy cases); *In re HNRC Dissolution Co.*, at \*6, *aff'd*, 585 B.R. 837 (B.A.P. 6th Cir. 2018), *aff'd*, 761 Fed. Appx. 553 (6th Cir. 2019) (claims based on alleged bad acts during a prior bankruptcy auction arose "in" the bankruptcy case).

In this case, Count One of the Complaint alleges that Mr. Techakraisri's failure to make payments was a breach of his obligations under the confirmed Plan. Complaint, AP ECF No. 1 at ¶¶ 81–86. The settlement itself existed only as a part of the confirmed Plan, and the claim to enforce that settlement would not have had an existence outside of the bankruptcy plan. I therefore have "arising in" jurisdiction over the claim. Count Two of the Complaint alleges that Mr. Techakraisri's failure to make payment was a knowing defiance of my confirmation order, and that misrepresentations in Mr. Techakraisri's statement of personal financial condition violated his obligations under the confirmation order. *Id.* at ¶¶ 88–93. These claims seek the enforcement of orders that I previously entered. They therefore "arose in" the chapter 11 cases, and I have subject matter jurisdiction over these claims.

## C. "Related To" Jurisdiction

Generally, before a plan is confirmed, "a civil proceeding is related to a title 11 case if the action's outcome might have any conceivable effect on the bankrupt estate." *Residential Funding Co., LLC v. UBS Real Estate Sec., Inc. (In re Residential Capital, LLC)*, 515 B.R. 52, 63 n.12 (Bankr. S.D.N.Y. 2014) (citing *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 579 (2d Cir. 2011)). Section 1334 of title 28 does not distinguish between a court's pre-confirmation and post-confirmation jurisdiction. However, if a lawsuit is filed after a business has reorganized and emerged from bankruptcy the "conceivable effect" test often gives way to a more limited "close nexus" test. *ACE Am. Ins. Co. v. DPH Holdings Corp. (In re DPH Holdings Corp.)*, 448 Fed. Appx. 134, 137 (2d Cir. 2011) (summary order). Under the "close nexus" test, "related

to" jurisdiction does not exist unless (a) a dispute has a close nexus to the bankruptcy case (as when a matter requires interpretation or administration of the confirmed plan), and (b) the plan retains jurisdiction over the dispute. *Savoy Senior Hous. Corp. v. TRBC Ministries, LLC*, 401 B.R. 589, 597 (S.D.N.Y. 2009).

Courts have applied the more limited "close nexus" test after a reorganized debtor has emerged from bankruptcy because the purpose of plan confirmation is to free the reorganized business from court supervision. *See Park Ave. Radiologists, P.C. v. Melnick (In re Park Ave. Radiologists, P.C.)*, 450 B.R. 461, 468 (Bankr. S.D.N.Y. 2011); *see also Pettibone Corp. v. Easley*, 935 F.2d 120, 122 (7th Cir. 1991) (noting that after confirmation, a reorganized company "is without the protection of the bankruptcy court" and "may not come running to the bankruptcy judge every time something unpleasant happens"). The First Circuit Court of Appeals has held, however, that the "conceivable effect" test (rather than the "close nexus" test) ought to apply where a debtor is liquidated rather than reorganized. *Boston Reg'l Med. Ctr., Inc. v. Reynolds (In re Boston Reg'l Med. Ctr., Inc.)*, 410 F.3d 100, 106 (1st Cir. 2005). The First Circuit explained the difference as follows:

> Typically, a reorganized debtor is attempting to make a go of its business. Thus, its actions (including any involvement in litigation) redound primarily to that end and only affect the underlying bankruptcy proceeding in a tangential or derivative way. . . By contrast, a liquidating debtor exists for the singular purpose of executing an order of the bankruptcy court. Any litigation involving such a debtor thus relates much more directly to a proceeding under title 11.

*Id.* at 107 (citations omitted).

The Second Circuit Court of Appeals has not ruled on this issue, but many decisions in this district have cited the First Circuit ruling with approval. *See, e.g., Fried v. Lehman Bros. Real Estate Assocs. III, L.P.*, 496 B.R. 706, 710 (S.D.N.Y. 2013); *AYH Wind Down LLC v. Engelman (In re All Year Holdings Ltd.)*, 2024 Bankr. LEXIS 827, at *10–12, 14–15 (Bankr. S.D.N.Y. Apr.

3, 2024); *Stillwater Liquidating LLC v. Net Five at Palm Pointe, LLC (In re Stillwater Asset Backed Offshore Fund Ltd.)*, 559 B.R. 563, 573–75 (Bankr. S.D.N.Y. 2016); *Cross Media Mktg. Corp. v. CAB Mktg., Inc. (In re Cross Media Mktg. Corp.)*, 367 B.R. 435, 444 (Bankr. S.D.N.Y. 2007). Many other decisions in this district have approved the First Circuit reasoning, though they have not found it necessary to rule on the point. *See, e.g., Kirschner v. Grant Thornton LLP (In re Refco, Inc Sec. Litig.)*, 628 F. Supp. 2d 432, 442 (S.D.N.Y. 2008) (finding the First Circuit reasoning "persuasive" but concluding that jurisdiction existed no matter which test applied); *Ames Dep't Stores, Inc. v. Lumbermens Mut. Cas. Co. (In re Ames Dep't Stores, Inc.)*, 542 B.R. 121, 137 n.52 (Bankr. S.D.N.Y. 2015) (approving the First Circuit view but finding it unnecessary to rule because "related to" jurisdiction existed no matter which test applied); *In re Residential Capital, LLC*, 515 B.R. 52, 63 n.12 (Bankr. S.D.N.Y. 2014) (noting the issue but declining to rule on the point because the court had core jurisdiction over the matter).

Although this case did not provide for the liquidation of the debtors, the claims that are being asserted here are not being asserted by the reorganized debtors themselves. The claims at issue were assigned to the Creditor Trust, which is liquidating its assets (including the claims it acquired) in order to fund distributions to creditors. It is therefore more appropriate, as to these particular claims, to apply the "conceivable effect" test in measuring the scope of the Court's "related to" jurisdiction. *See Stillwater*, 559 B.R. at 574–75.

In any event, I find that "related to" jurisdiction would exist regardless of whether a "close nexus" or "conceivable effect" test were to be applied. The claims asserted here will directly affect the amounts that creditors might recover under the confirmed Plan, and therefore there is a "close nexus" between these claims and the bankruptcy cases. The confirmed Plan provided that this Court would retain jurisdiction with respect to all of the claims that had been assigned to the

Creditor Trust.  *See* Plan, ECF No. 445 at Article X.  The confirmation order elaborated on this point, and stated explicitly that the "Retained Causes of Action" – which included the claims presently asserted against Mr. Techakraisri – "are integral components of the funding of the Reorganized Debtors as well as the Creditor Trust, and the implementation of the Plan generally" and that the "Court retains jurisdiction regarding such Causes of Action, as is necessary and appropriate to facilitate implementation of the Plan." *Id.* at ¶ DD.  It is plain that I have jurisdiction over the claims under the "conceivable effect" test, and I conclude that I have "related to" jurisdiction all the Trustee's claims even if a "close nexus" test were to be applied.

### **Personal Jurisdiction**

The Federal Rules of Bankruptcy Procedure provides that "[i]f the exercise of jurisdiction is consistent with the Constitution and laws of the United States" then the service of a summons in accordance with the provisions of Rule 4004, or in accordance with the provisions of Rule 4 of the Federal Rules of Civil Procedure, "is effective to establish personal jurisdiction over the person of any defendant with respect to a case under the Code or a civil proceeding arising under the Code, or arising in or related to a case under the Code."  Fed. R. Bankr. P. 7004(f).

**A.    Service of Process**

Plaintiff attempted to complete the service of process in a variety of ways.

**1.    Alleged Service by Mail in the United States**

Federal Rule of Bankruptcy Procedure 7004(b) permits service of a summons and complaint in an adversary proceeding to be accomplished by mail, but only within the boundaries of the United States.  Fed. R. Bankr. P. 7004(b).  In such cases the mail must be addressed to "the individual's dwelling house or usual place of abode or to the place where the individual regularly conducts a business or profession."  The Trustee contended that service was validly accomplished by mailing the summons and complaint to Mr. Techakraisri at an address associated with Argus

Management in Massachusetts.  However, the relevant records of the New York Secretary of State list that address as one that may be used for the service of papers on Old DDUS, not Mr. Techakraisri.  The Trustee offered no evidence that Mr. Techakraisri ever designated that address as one that could be used for service of process upon him personally.  More importantly, there was no evidence that, at the time of service, Mr. Techakraisri either resided at that address or regularly conducted a business or profession at that address, or even that he continued to use that address for any purpose at all.  The mailing to Argus Management therefore did not constitute valid service.

**2.    Personal Service Upon an Employee at Mr. Techakraisri's Residence in Thailand**

Rule 4(f)(1) of the Federal Rules of Civil Procedure (made applicable by Fed. R. Bankr. P. 7004) provides that service in a foreign country may be accomplished by any internationally agreed means of service that is reasonably calculated to provide notice, such as those authorized by the Hague Convention.  If there is no such internationally agreed means of service then Rule 4(f)(2) provides that service may be accomplished in a foreign country (a) as prescribed by that country's law; (b) as the country directs in response to a letter rogatory or letter of request; or (c) "unless prohibited by the foreign country's law," by (i) delivering personally, or (ii) using any form of mail "that the clerk addresses and sends to the individual and that requires a signed receipt."  Fed. R. Civ. P. 4(f)(2).

The Trustee has submitted the declaration of Mr. Tongmee, a licensed Thai attorney,  which confirms that there is no international agreement that governs the service of a U.S. summons and complaint in Thailand.  AP ECF No. 27.  It is therefore necessary to determine whether service was made in accordance with one of the means authorized by Fed. R. Civ. P. 4(f)(2).

Mr. Tongmee's Declaration confirms that Thai law does not prohibit any specific method of service and does not prescribe that any specific procedure be followed for the service of papers

for a foreign proceeding. *Id.* at ¶¶ 6, 7. He also confirms that section 74 of Thai Civil Procedure Code permits a pleading to be served between sunrise and sunset on the party to whom the complaint is directed, at his domicile or business office. Such service is sufficient under section 76 of the Thai Civil Procedure Code if the papers are delivered at a residence or business address of the defendant to an individual over 20 years of age who is an employee of the defendant.

The evidence submitted to me included the Affidavit of Service sworn to by Mr. Suthi Kaewso, confirming that the summons and complaint were hand-delivered by a person who is more than 18 years of age to Mr. Techakraisri's registered home address in Bangkok, Thailand after sunrise and before sunset, where they were accepted by an individual over 20 years of age (Mr. Suphap Rongsayamanont) who identified himself as an employee of Mr. Techakriasri and who signed a receipt for the service (a copy of which was attached as Exhibit B to Mr. Kaewso's affidavit.) This was proper and sufficient service under Thai law and under Rule 4.

### 3.    Service Upon Counsel in the United States

The Trustee served the summons and complaint on Mr. Baldiga, who had entered an appearance in the chapter 11 cases on behalf of Mr. Techakraisri. Mr. Baldiga did not enter a formal appearance in this adversary proceeding, but he did participate by telephone in a status conference that was held on August 10, 2023 to discuss the motion for entry of a default judgment, at which time he confirmed that he represented Mr. Techakraisri with respect to these matters. *See* Transcript, AP ECF No. 10. The Trustee contended that service upon Mr. Baldiga was sufficient under section 75 of the Thai Civil Procedure Code, which provides that the service of process upon a defendant may be completed by serving the attorney whom a defendant has appointed to conduct a case. However, the provisions of the Thai Civil Procedure Code are only relevant to the extent that service was completed "at a place not within any judicial district of the United States." Fed.

R. Civ. P. 4(f). Mr. Baldiga was located in the United States, not in Thailand. No provision of U.S. law has been cited that would permit service to be completed in this way.

### 4.    Service by Registered Mail in Thailand

The Trustee provided evidence that Thai counsel sent the summons and complaint by registered mail to Mr. Techakraisri's residence in Thailand. Mr. Tongmee confirmed that a Thai court could have authorized such service by registered mail, but there is no evidence that a Thai court was asked to do so. In the absence of such an order it does not appear that Thai law authorized service to be completed in this manner.

### 5.    Service by Email, Federal Express and US Mail

The Trustee provided evidence that U.S. counsel sent the summons and complaint to Mr. Techakraisri by email on September 1, 2022. The Affidavit of Service included an email receipt confirming Mr. Techakraisri's receipt of the message. The Trustee also offered evidence that U.S. counsel sent copies of the summons and complaint to Mr. Techakraisri's address in Thailand by Federal Express and by U.S. mail. I have little doubt that Mr. Techakraisri received the e-mail message and the Federal Express deliveries and the U.S. mail deliveries that were sent to his address in Thailand, just as he likely received the registered mail packages that were sent in Thailand. However, the Trustee has not cited any rule or applicable principle that would have permitted service of the summons and complaint to be completed in these ways.

### 6.    Service Under Rule 4(f)(3)

Rule 4(f)(3) provides that service in a foreign country may be completed "by other means not prohibited by international agreement, as the court orders." Fed. R. Civ. P. 4(f)(3). This rule authorizes alternative forms of service that are "reasonably calculated to provide a defendant with notice of the action against it and an opportunity to defend, and that is not otherwise prohibited by

international agreement." *Securities & Exch. Comm'n v. Anticevic*, 2009 U.S. Dist. LEXIS 11480, at *3 (S.D.N.Y. Feb. 8, 2009). If I had been asked to do so, I am confident that I would have authorized service of process upon Mr. Techakraisri by email, federal express, U.S. mail, registered mail in Thailand, or delivery to Mr. Baldiga, or by some combination of those methods. However, the Trustee made no such application. While there is some authority outside this district for the retroactive approval of alternative service under Rule 4(f)(3), I think the better view is that such approval should be obtained in advance. *See, e.g., Integr8 Fuels, Inc. v. Bunker Pan. SA*, 2017 U.S. Dist. LEXIS 225398, at *10 (S.D.N.Y. Fed. 2, 2017) (citing decisions); *Ryzhov v. Malofeyev*, 2024 U.S. Dist. LEXIS 19836 (S.D.N.Y. Feb. 5, 2024) (holding that retroactive approval under Rule 4(f)(3) is impermissible); *Havlish v. Bin Laden (In re Terrorist Attacks on September 11, 2001)*, 2022 U.S. Dist. LEXIS 63505 (S.D.N.Y. Apr. 5, 2022) (same). In the absence of an advance approval under Rule 4(f)(3) a defendant would have no way of knowing whether a particular form of service was purportedly valid. It would hardly be fair to allow service to be validated in hindsight and at the time when a default had already occurred.

Although most of the methods of service described above were not sufficient, the personal delivery of the summons and complaint to Mr. Techakraisri's employee, at Mr. Techakraisri's home, was sufficient for the reasons stated above.

**B.    Due Process**

Due process requires that in order to subject a defendant to personal jurisdiction the defendant must have sufficient minimum contacts with the forum in which the defendant is sued such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 313–16 ("[The] constitutional touchstone" of the determination whether an exercise of personal jurisdiction comports with due process "remains whether the defendant purposefully established 'minimum contacts' in the forum State.");

*Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996) ("The due process test for personal jurisdiction has two related components: the 'minimum contacts' inquiry and the 'reasonableness inquiry.'").

It is well established that, "[i]n adversary proceedings, courts must determine whether the defendant has minimum contacts with the United States, rather than with the forum state." *In re Fairfield Sentry*, 657 B.R. 1, 11 (Bankr. S.D.N.Y. 2024) (quoting *Picard v. Fairfield Greenwich Grp. (In re Fairfield Sentry Ltd.)*, 627 B.R. 546, 565 n.12–13 (Bankr. S.D.N.Y. 2021) ("When jurisdiction is satisfied through Bankruptcy Rule 7004, a bankruptcy court need not address its state's long arm statute")). Minimum contacts must have a "basis in 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Asahi Metal Indus. Co. Superior Court of Cal*, 480 U.S. 102, 109 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). In addition, the plaintiff's claim must arise out of, or relate to, the defendant's conduct in the forum jurisdiction. *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019). Random, fortuitous or attenuated contacts are not enough. *Id.* However, specific jurisdiction is established when a foreign defendant "'purposefully direct[s] his activities at residents of the forum' and . . . the underlying cause of action 'arise[s] out of or relate[s] to those activities.'" *Burger King Corp.*, 471 U.S. at 472. It is sufficient if a defendant "purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018) (quoting *Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013).

The reasonableness inquiry asks, "whether the assertion of personal jurisdiction comports with "traditional notions of fair play and substantial justice, "that is, whether it is reasonable under

the circumstances of the particular case." *Metropolitan Life Ins. Co.*, 84 F.3d at 568 (citing *Int'l Shoe*, 326 U.S. at 316). The Supreme Court has held that a court must evaluate the following factors in considering the "reasonableness" of an exercise of personal jurisdiction: (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies. *Asahi*, 480 U.S. at 113–14; *see also Burger King*, 471 U.S. at 476–77; *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980).

I find that specific jurisdiction exists here. Mr. Techakraisri was the chairman of the board of directors at the time of the bankruptcy filings in this Court. He participated actively in proceedings in this Court. Most importantly, he entered into a settlement agreement that was incorporated into the confirmed bankruptcy plan, that was entered into in New York and that is governed by New York law. In these ways, Mr. Techakraisri purposefully availed himself of the privilege of conducting activities in the United States, thus invoking the benefits and protections of US laws. He surely knew, or should have known, that a suit to enforce his obligations under the Plan would likely be filed in this Court.

In addition, as explained more fully below, Mr. Techakraisri was a fiduciary for two Debtors that were organized under Delaware law. The claims asserted in Counts Three through Seven of the Complaint are claims that belonged to those Delaware entities. By accepting those fiduciary positions, Mr. Techakraisri purposefully availed himself of the protections afforded by Delaware law, and subjected himself to the duties imposed by Delaware law. Mr. Techakraisri also agreed that the Creditor Trust could pursue the Delaware entities' claims in the event of his

failure to make the payments that he had agreed to make under the Plan, and he must have known and expected that any such litigation likely would occur in the United States.

Finally, the confirmation order (with the agreement of the parties) made clear that this Court retained jurisdiction, not only regarding the enforcement of the provisions of the plan and but also over to the causes of action that were assigned to the Creditor Trust. *See* Confirmation Order, Case No. 20-10916, ECF No. 445, ¶¶ DD, 19. For each of these reasons, Mr. Techakraisri therefore could and should have anticipated that he would be sued in this court with respect to the claims asserted in the Complaint.

I have also considered the factors identified by the Supreme Court, and I find that the exercise of personal jurisdiction over Mr. Techakraisri for purposes of this adversary proceeding is reasonable and consistent with due process. More particularly:

- This Court has a strong interest in adjudicating the case. The confirmation order (with the agreement of the parties) made clear that the provisions of the plan regarding the claims against Mr. Techakraisri were "integral components" of the Creditor Trust and of the implementation of the Plan generally.

- As noted above, this Court retained jurisdiction regarding claims to enforce the plan and regarding the causes of action that were assigned to the Creditor Trust. *See id.* Mr. Techakraisi and his counsel were aware of those provisions of the confirmation order and consented to them.

- The Creditor Trust has an important interest in obtaining effective relief, as the settlement payments (or the pursuit of claims against Mr. Techakraisri in the event of a default by him) were key assets that were assigned to the Trust.

- The claim to enforce the settlement terms arises under a settlement agreement made in New York that was incorporated in the plan and that is governed by New York law.

- As explained more fully below, the claims based on breaches of fiduciary duty and fraudulent transfer relate to two companies that were organized under Delaware law and that Mr. Techakraisri controlled.  He had ample reason to know that Delaware law and US law would govern such claims and that litigation (if it were to occur) would likely be in the United States.

- Mr. Techakraisri did not face any unfair burden in litigating in this Court.  He is represented by New York counsel who is well aware of this proceeding, who participated in one hearing (though electing not to enter a formal appearance) and who was fully capable of representing Mr. Techakraisri's interests.

Given the nature of Mr. Techakraisri's purposeful contacts with this State, and the other factors discussed above, the exercise of personal jurisdiction over Mr. Techakraisri with respect to this adversary proceeding is proper and is consistent with due process.

### Constitutional Power to Render Final Judgment

A separate issue to be considered is whether this Court has the Constitutional authority to issue a final judgment with respect to each of the pleaded claims, or whether I must instead issue a report and recommendation to the United States District Court.

In *Stern v. Marshall*, 564 U.S. 462 (2011), the United States Supreme Court held that bankruptcy courts may enter final orders and judgments with respect to matters that are integral to the adjustment of debtor-creditor relations.  Without the consent of the parties, however, a bankruptcy court (as an Article 1 court) may not enter a final judgment with respect to certain

types of matters.  As to such matters the Bankruptcy Court must issue a report and recommendation to the District Court, which then has the power and authority to issue a final judgment.

The Supreme Court's decision in *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015), discussed the manner in which a party's "consent" to a final determination of a matter by a bankruptcy court may be manifested.  The Court held:

> Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be express.  Nor does the relevant statute, 28 U.S.C. § 157, mandate express consent; it states only that a bankruptcy court must obtain the "consent" – consent *simpliciter* – "of all parties to the proceeding" before hearing and determining a non-core claim.

*Id.* at 683–84.  The Supreme Court approved the application of the "implied consent" standard that it had developed in another line of cases involving parties' consents to the determination of proceedings by magistrate judges.  *Id*. at 684–85.  The Court stressed that the consent must be voluntary and knowing, but emphasized that the consent did not need to be "express."  *Id.*

"Implied consent" issues most commonly arise when a party participates in a litigation without stating, affirmatively, that the party either consents to the court's power to issue a final judgment or objects to it.  However, many courts have also considered the question of whether a defendant's default in responding to a complaint in an adversary proceeding constitutes an implied consent to the issuance of a final judgment by a bankruptcy court.  The leading decisions are those issued by Judge Glenn in *Kravitz v. Deacons (In re Advance Watch Co. Ltd.)*, 587 B.R. 598, 601–602 (Bankr. S.D.N.Y. 2018) and *Executive Sounding Bd. Assocs. v. Advanced Mach. & Eng'g Co. (In re Oldco M. Corp.)*, 484 B.R. 598, 610–15 (Bankr. S.D.N.Y. 2012).  In those decisions, Judge Glenn held that a defendant's failure to appear, despite a valid service of process, constituted a voluntary and knowing consent to the bankruptcy court's issuance of a final judgment by default.  Many other courts have reached the same conclusion.  *See, e.g., Moden v. Ditech Fin., LLC (In re Moden)*, 2021 Bankr. LEXIS 3165, at *11 n.27 (10th Cir. BAP Nov. 12, 2001) (collecting cases).

In this case, the summons that was served upon Mr. Techakraisri contained the following

statement:

> IF YOU FAIL TO RESPOND TO THIS SUMMONS, YOUR FAILURE
> WILL BE DEEMED TO BE YOUR CONSENT TO ENTRY OF A
> JUDGMENT BY THE BANKUPTCY COURT AND JUDGMENT BY
> DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF
> DEMANDED IN THE COMPLAINT.

*See* Summons, AP ECF No. 2.  That language could not have been clearer.  As in *Kravitz*, Mr.

Techakraisri's knowing and voluntary election not to appear in response to the summons,

notwithstanding the clear language of the summons that was validly served upon him, was a

knowing and voluntary consent to the entry of a final default judgment by this Court.  Accordingly,

this Court has the Constitutional power to enter a final judgment.

### <u>Application of Statutes of Limitation</u>

It appears evident, on the face of the Complaint, that some of the asserted claims are subject

to statute of limitations defenses.  I asked whether the applicable statutes of limitation should be

considered and applied by me in determining the matters for which the Trustee is entitled to a

default judgment, and I asked for further briefing on that issue.

A statute of limitations defense is an affirmative defense under federal pleading rules.  *See*

Fed. R. Civ. P. 8(c)(1); Fed. R. Bankr. P. 7008.  Mr. Techakraisri did not file a responsive pleading.

At least one decision by the Second Circuit Court of Appeals, and decisions by a number of other

courts, have held that, if no responsive pleading has been filed, a defaulting defendant may be

deemed to have waived any affirmative defenses that could have been asserted.[2]   However, the

---

[2]    *See, e.g., U.S. Sec. and Exch. Comm'n. v. Boock*, 750 Fed. Appx. 61, 62 (2d Cir. 2019)
(holding that the failure to raise a statute of limitations defense by filing an answer constitutes
a waiver of the defense); *Trajanos v. Marcos (In re Est. of Marcos Hum. Rts. Litig.)*, 978 F.2d
493, 495 n.2 ( 9th Cir.1992) (explaining that the statute of limitations defense was waived by
a default); *Gurung v. Malhotra*, 851 F. Supp. 2d 583, 592 (S.D.N.Y. Feb. 22, 2012)

Second Circuit Court of Appeals has confirmed that in certain circumstances a court may raise a statute of limitations defense *sua sponte* if the defense appears on the face of the pleadings. *See, e.g., Walters v. Indus. & Commer. Bank of China, Ltd.*, 651 F.3d 280, 293 (2d Cir. 2011) (noting that courts may dismiss an action *sua sponte* on limitations grounds in certain circumstances where the facts supporting the statute of limitations defense are set forth in the papers plaintiff himself submitted). Some courts have relied on this principle in holding that a statute of limitations defense that is clear from the pleadings should be considered and enforced notwithstanding a defendant's default. *See, e.g, De Santis v. City of New York*, 2014 U.S. Dist. LEXIS 8095, at *15–16 (S.D.N.Y. Jan. 22, 2014) (concluding that the defendant did not waive her statute of limitations defense even though she defaulted); *Gerdova v. Krolewskie Jadlo and Affiliated Restaurants*, 2021 WL 8316277, at *5 (E.D.N.Y. July 21, 2021) (declining to ignore the statute of limitations defense where defendants failed to answer the Complaint or otherwise appear); *Oak-Jin Oh v. Soo Bok Choi*, 2016 U.S. Dist. LEXIS 25553, at *31 (E.D.N.Y. Feb. 29, 2016) (". . . [T]he face of the complaint triggers statute of limitations concerns . . . where applicable defenses are apparent on the face of the complaint, it is appropriate for the Court to raise them *sua sponte*.").

It appears that this issue has often arisen in this district in cases that assert claims under the Fair Labor Standards Act. *See Zhenhai Wei v. Sichuan Pepper, Inc.*, 2022 U.S. Dist. LEXIS 26477, at *38–39 (D. Conn. Jan. 17, 2022) (collecting citations). While the courts have not been uniform

---

(concluding that defendant waived its FLSA statute of limitations defense by failing to appear and assert such defense; *Alonso v. New Day Top Trading, Inc*., 2020 U.S. Dist. LEXIS 116047, at *25 (S.D.N.Y. June 29, 2020), *report and recommendation adopted*, 2021 U.S. Dist. LEXIS 194150 (S.D.N.Y. Oct. 7, 2021) ("The statute of limitations provides an affirmative defense, which is waived by the defendant upon its default").

in their rulings, the *De Santis* decision in this district contained the following reasoning that I find

persuasive:

> While district courts do not routinely dismiss time-barred claims sua sponte, the reasons for this practice do not apply with the same force in cases where defendants have defaulted. "The principle that the statute of limitations should not ordinarily be raised sua sponte arises from the adversarial nature of our justice system, which presumes that parties are responsible for raising their own defenses." Report, 2013 U.S. Dist. LEXIS 95169, 2013 WL 3388455, at *3 (internal quotations omitted). The adversarial ideal motivating the presumption against sua sponte dismissal is simply unobtainable in default judgment cases. "It is well established that default judgments are disfavored" precisely because they do not allow "for cases to be adjudicated on the merits." *Pecarsky v. Galaxiworld.com Ltd.*, 249 F.3d 167, 174 (2d Cir. 2001). In fact, in default judgment cases, courts are required to approximate the adversarial model by independently evaluating whether the Complaint establishes liability as a matter of law. *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009); *see also Bermudez v. Reid*, 733 F.2d 18, 21 (2d Cir. 1984) ("[T]he court [may] require [P]laintiff to produce evidence in support of the claims before entering a [default] judgment."), *cert. denied*, 469 U.S. 874, 105 S. Ct. 232, 83 L. Ed. 2d 161. Due to the unique circumstances that they present, default judgments overcome the presumption that "the parties [are] responsible for raising their own defenses." *United States v. Mitchell*, 518 F.3d 740, 749 (10th Cir. 2008).

*See De Santis,* 2014 U.S. Dist. LEXIS 8095 at *16–18. The Court also noted in *De Santis* that a

party is not entitled to the entry of a default judgment as a matter of right, and that the Court had

discretion to evaluate any aspect of the defaulting defendant's asserted liability, including as to

statute of limitations defenses that were plainly applicable. *Id.* at 18–19.

I agree with the court's conclusion in *De Santis* and for a number of reasons, I adopt the

same approach in this case.

First, there are many instances in which "waiver" rules are applied differently in the default

context. For example, Rule 12(h) of the Federal Rules of Civil Procedure expressly states that

certain defenses are deemed to be "waived" if they are not included in an answer or in a motion.

These defenses include defenses asserting a lack of subject matter jurisdiction, a lack of personal

jurisdiction, and failure to state a claim upon which relief may be granted. *Id.* In the default

context, however, the case law makes clear that, for a variety of due process and other reasons a court may not simply treat these defenses as having been waived, and instead should independently assess the potential validity of the defenses before entering a default judgment.

Accordingly, as explained at the outset of this Decision, a court has an independent obligation to determine that it has subject matter jurisdiction over a case. Similarly, the Second Circuit Court of Appeals has held that courts "may" assure themselves that they have personal jurisdiction over defendants before entering default judgments, and courts in other Circuits have held that courts *must* do so. *See Sinoying Logistics Pte Ltd. v. Yi Da Xin Trading Corp.*, 619 F.3d 207, 213 (2d Cir. 2010) (holding that before granting a default judgment a court "may" first assure itself that it has personal jurisdiction over the defendant, but not deciding whether a court "must" do so); *Williams v. Life Sav. & Loan*, 802 F.2d 1200, 1203 (10th Cir. 1986) (holding that "when entry of a default judgment is sought against a party who has failed to plead or otherwise defend, the district court has an *affirmative duty* to look into its jurisdiction both over the subject matter and the parties") (emphasis added); *Sys. Pipe & Supply, Inc. v. M/V Viktor Kurnatovskiy*, 242 F.3d 322, 324 (5th Cir. 2001) (same); *Tuli v. Republic of Iraq (In re Tuli)*, 172 F.3d 707, 712 (9th Cir. 1999) (same).

The defense of "failure to state a claim" is another defense that is deemed to have been waived under Rule 12(h) if it has not been asserted in a pleading or in a motion. Fed. R. Civ. P. 12(h). Nevertheless, it is well-settled that a default does not constitute an admission of the legal sufficiency of a complaint. As explained above, the Second Circuit Court of Appeals has instructed courts in this Circuit that they should independently review the legal sufficiency of a complaint before entering a default judgment. *Finkel*, 577 F.3d at 84, 86–87 (holding that after a default a court is still required to determine whether the factual allegations in a pleading "establish

[the defendant's] liability as a matter of law," and directing the dismissal of an action because the allegations were insufficient to show that the defendant was a fiduciary).

Rule 12(h) expressly states that each of the foregoing defenses is waived if it has not been asserted in a pleading or raised by motion. Courts nevertheless have held, for a variety of due process and other reasons, that such waiver notions should not be applied when courts are asked to enter default judgments, and that courts may, or in some cases must, evaluate the merits of these defenses before entering default judgments. If defenses that are subject to the explicit waiver language of Rule 12(h) should not be treated as having been "waived" by a failure to appear, then it seems evident that "waiver" notions also should not automatically and reflexively be applied to bar the consideration of plainly valid affirmative defenses (such as defenses based on statutes of limitations) that appear on the face of a complaint.

Second, many affirmative defenses (such as accord and satisfaction, duress, estoppel, laches, res judicata) require consideration of facts that may not appear on the face of a complaint, so that a court has little to no basis to apply them in the context of a motion for entry of a default judgment. Sometimes, however – in particular as to defenses based on statutes of limitations – an affirmative defense may be obvious based on the allegations of the complaint. In such a case the Court has all the facts and information before it that are needed to make a decision. If a court is supposed to consider the legal sufficiency of a claim before entering a default judgment (as the case law makes clear that a court is required to do), then it would be absurd (and somewhat arbitrary) to ignore valid affirmative defenses that are clear from the complaint itself.

Finally, it is well-established that courts have discretion as to whether to enter default judgments. Accordingly, even if a court might be entitled to treat a default as a waiver of a statute

of limitations defense, the applicable rules and case law make clear that a court is not required to do so, and I elect not to do so in this case.

Accordingly, if valid statute of limitations defenses are clear from the face of the Complaint, I will apply those defenses in ruling on the motion for entry of a default judgment.

### The Asserted Claims

## I.    Count One: Breach of the Settlement Agreement Incorporated in the Plan

The Plan incorporated a settlement with Mr. Techakraisri, as part of which Mr. Techakraisri committed to make payments on a specified schedule. The Trustee provided ample proof that Mr. Techakraisri had failed to make the final $750,000 settlement payment that he had agreed to make. Mr. Techakraisri's counsel acknowledged on two occasions that Mr. Techakraisri had failed to make the payment and that he had no substantive defense that would have justified that failure.

The Trustee also contended that Mr. Techakraisri had breached his obligation to provide an honest financial statement (in that he had failed to reveal his ownership of certain real estate and certain other assets) and that this breach caused the Trustee to incur damages of $8,621, representing the costs of investigating and identifying assets that should have been voluntarily disclosed. However, the evidence at trial about this particular claim was deficient. The Declaration of Anthony Milazzo (Trial Exh. 8) stated that the Creditor Trust had conducted a search in Thailand for publicly available records of Mr. Techakraisri's assets and that the cost of the investigation was $6,167, but no further supporting details were provided. He also asserted that the Trustee had paid "third-party investigatory fees in the amount of $2,454," but no further details or support were provided. I suspect that investigations as to Mr. Techakraisri's assets would have occurred following his default regardless of what he had previously disclosed. In any event,

there was insufficient evidence as to the nature and circumstances of these particular expenses to permit them to be awarded as damages.

Mr. Techakraisri's failure to make the $750,000 payment (plus interest that had accrued on that amount prior to the due date) constituted a breach of a contract that was incorporated into the Plan, and the Trustee is entitled to judgment on that claim. The Plan made clear that in the event of a payment breach the Trustee could pursue other claims against Mr. Techakraisri but that Mr. Techakraisri would not be freed from his obligation to make the full $1 million payment that he had agreed to make. The Plan instead provided that any amounts recovered by the Creditor Trust on its pursuit of non-released claims would first be applied against the balance of the payments that Mr. Techakraisri had agreed to make under the Plan. *See* Plan, § IV(F)(7)(h). Effectively, this ensured the Trustee of a minimum recovery of at least $1 million. Accordingly, any judgment in favor of the Trustee with respect to Count One does not represent an amount that the Trustee may recover in addition to any judgments rendered on other, non-released claims. Instead, any amounts recovered on any judgments on non-released claims will reduce the amounts owed by Mr. Techakraisri under a judgment with respect to Count One.

## II.    Count Two – Contempt of Court

The Trustee alleges that the confirmed plan constituted a court order that directed Mr. Techakraisri to make certain payments and that his failure to do so should be treated as a contempt of court. The Trustee alleges that such a contempt finding would entitle the Trustee to recover attorneys' fees in addition to the enforcement of the underlying payment obligation. The Trustee separately has alleged that Mr. Techakraisri made misrepresentations in the personal financial statement that he supplied, and that this alleged wrongdoing also constituted a contempt of court that should entitle the Trustee to recover attorneys' fees.

Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A). The Plan itself incorporated Mr. Techakraisri's agreement to make payments, and I approved that settlement as being reasonable and in compliance with section 1123. The confirmation of the Plan then established Mr. Techakraisri's liability to the Creditor Trust. However, in that respect the entry of the confirmation order was no different from any other order or judgment that a court might enter that approves a settlement or that otherwise establishes one party's liability to another. My order confirmed Mr. Techakraisri's liability, but that does not mean that I "ordered" payment in a manner that could give rise to contempt sanctions.

It has long been recognized that "[o]rdinary money judgments reflect an adjudication of liability but they do not enter any command to a defendant." Dan B. Dobbs & Caprice L. Roberts, LAW OF REMEDIES: DAMAGES, EQUITY, RESTITUTION 1, § 1.4 (3rd ed. 2018). Since a money judgment does not constitute a personal order by a court commanding payment by a party, a, "defendant who does not pay is not jailed for contempt." *Id.*; *see also* Moore's Federal Practice – Civil §§ 69App. 102 ("[i]t has long been understood that a federal court should not enforce a money judgment under Rule 69 by contempt or methods other than a writ of execution, except when warranted by established principles."). This rule is embedded in the New York Civil Practice Law and Rules, which are made applicable here. *See* Fed. R. Bankr. P. 7069 (incorporating Rule 69 as to the enforcement of judgments in bankruptcy court adversary proceedings); Fed. R. Civ. P. 69 (incorporating state procedural rules regarding the enforcement of judgments); N.Y. C.P.L.R. §§ 5401, 5104 (making clear that failures to pay money judgments are not subject to contempt sanctions, and that contempt sanctions are reserved for failures to comply with orders that are not enforceable as money judgments); Richard C. Reilly, Practice Commentaries C5104:1, N.Y.

C.P.L.R. § 5104  ("Excluded from the contempt category by that criterion are the money judgment, which enjoys the broad array of devices supplied by Article 52 of the CPLR (of which the execution is but one)).  The principle has repeatedly been applied by federal courts in this district[3] and by courts in other jurisdictions.[4]

The mere fact that a court has reserved jurisdiction to enforce a settlement agreement is not enough to bring contempt powers into play.  *See D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455, 461 (7th Cir. 1993).  Nor is a court's approval of a stipulation or other contract sufficient.  The breach of a monetary obligation that is created by contract (even a court-approved settlement agreement) is not enforceable by contempt unless a court order explicitly commands that the obligation be fulfilled.  *H.K. Porter Co., Inc. v. Nat'l Friction Prods. Corp.*, 568 F.2d 24 (7th Cir. 1977) (holding that contempt is appropriate only for violation of a court order that sets forth "an unequivocal command" in specific detail).  Furthermore, "the size of the award and the difficulties in enforcing the judgment due to . . . the uncooperativeness of the judgment debtor are not the

---

[3]   *Kerr v. John Thomas Fin.*, 2017 U.S. Dist. LEXIS 15684, at *8–9(S.D.N.Y. Feb. 3, 2017), report and recommendation adopted, 2017 WL 1609224 (S.D.N.Y. May 1, 2017) ("Pursuant to Federal Rule of Civil Procedure 69(a)(1), money judgments are enforced by entry of judgment and writ of execution, not by a contempt order absent exceptional circumstances."); *Ecopetrol S.A. v. Offshore Exploration & Prod. LLC*, 172 F. Supp. 3d 691, 695–98 (S.D.N.Y. 2016); *Hausler v. BNP Paribas S.A.*, 169 F. Supp. 3d 531, 536 (S.D.N.Y. 2016); *NYKCool A.B. v. Pac. Fruit Inc.*, 2012 U.S. Dist. LEXIS 52690, at *27 (S.D.N.Y. Apr. 16, 2012) (Peck, M.J.) (Report & Recommendation), objections overruled by, 2012 U.S. Dist. LEXIS 152925 (S.D.N.Y. May 9, 2012) (Kaplan, D.J.).

[4]   *Aetna Cas. & Sur. Co. v. Markarian*, 114 F.3d 346, 349 (1st Cir. 1997); *Hilao v. Estate of Marcos*, 95 F.3d 848, 854–55 (9th Cir. 1996); *Combs v. Ryan's Coal Co.*, 785 F.2d 970, 980 (11th Cir. 1986) ("It is . . . clear that when a party fails to satisfy a court-imposed money judgment the appropriate remedy is a writ of execution, not a finding of contempt."); *New London Tobacco Mkt., Inc. v. Ky. Fuel Corp.*, 2022 U.S. Dist LEXIS 243063, at *6–8 (E.D. Ky. May 19, 2022); *Frazier v. APM Fin. Solutions, LLC*, 2015 WL 8483237, at *3 (D. Conn. Dec. 9, 2015); *Ciaprazi v. Cnty. of Nassau*, 2012 WL 95374, at *3 (E.D.N.Y. Jan. 12, 2012); *Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, 2010 U.S. Dist. LEXIS 101331, at *9–10 (N.D. Cal. Jan. 25, 2010).

types of extraordinary circumstances which warrant departure from the general rule" that money judgments are not enforced by an order of contempt. *NYKCool A.B. v. Pac. Fruit, Inc.*, 2012 U.S. Dist. LEXIS 52690, at *29–30 (S.D.N.Y. April 16, 2012) (quoting *Aetna Cas. & Sur. Co. v. Markarian*, 114 F.3d, 349 n.4 (1st Cir. 1997)).

For the foregoing reasons, Mr. Techakraisri's failure to pay the amounts he had promised to pay are breaches of contract, but they are not matters for which contempt sanctions are proper.

The Trustee also contends that Mr. Techakraisri did not accurately report his assets and liabilities in the financial statement that he delivered after the Plan was confirmed. Mr. Techakraisri agreed that he would supply a "sworn and truthful personal statement of assets and liabilities" no later than three days prior to the confirmation hearing. Plan, ECF No. 445, §§ I(A)(139), IV(F)(7). The Trustee contends that Mr. Techakraisri delivered a financial statement prior to the confirmation of the Plan, but that the financial statement was false, because it failed to disclose the existence of certain real estate and other assets that Mr. Techakraisri owns.

The Trustee contends that I should treat the inaccuracies in the financial statement as a contempt of court and that I should award the Trustee the costs that he incurred in identifying the otherwise undisclosed assets. However, under the terms of the parties' agreement the financial statement was supposed to be delivered in advance of the confirmation of the Plan. It was prepared and delivered on that schedule, and it bears the date of November 18, 2020 (one week prior to the entry of the confirmation order). I do not see how I could reasonably interpret my confirmation order as an instruction by the Court to perform an act that by its terms was supposed to have already been completed prior to the entry of the order. If the financial statement was inaccurate, that may have been a breach of Mr. Techakraisri's agreement with the Committee, but at the time it was prepared and delivered there was no court order in effect that could have been violated.

32

Finally, the Trustee alleges that Mr. Techakraisri and his counsel allegedly made misrepresentations to the Court in February 2022 when they stated, in status conferences, that Mr. Techakraisri did not have the ability to pay the remaining installment on the debt he owed to the Creditor Trust. The Trustee offered evidence that was sufficient to raise suspicions about Mr. Techakraisri's resources, but that evidence fell short of proving that a willful misstatement had been made. In fact, the statements were made by counsel (not by Mr. Techakraisri), and the Trustee explicitly has stated that he does not contend that counsel was aware of any inaccuracy in what counsel said.

As a matter of law, I do not find proper cause for a contempt finding. The Trustee conceded at the hearings that in the absence of a contempt judgment the Trustee has no right to seek recovery of attorneys' fees.

## III.    Count Three – The Alleged Guarantee Claim

The evidence showed that in February 2019, Mr. Techakraisri executed a "Guarantee and Indemnity" agreement with Grovepark. Mr. Techakraisri was defined as the "Guarantor" and Grovepark was defined as the "Beneficiary." *See* Declaration of Anthony Milazzo, AP ECF No. 11, at Exhibit 10. The agreement referenced a loan that Dean & Deluca, Inc. had made to Grovepark, and it set forth Mr. Techakraisri's irrevocable and unconditional guarantees "to the Beneficiary" that Mr. Techakraisri would repay up to $1,479,806 of the amount owed by Grovepark (with that amount being reduced proportionately to the extent Grovepark made other payments). However, no Debtor was a party to this agreement.

The Guarantee and Indemnity Agreement stated that the parties' obligations would be governed by English law. *Id.* at ¶ 9. It also stated that "[u]nless expressly provided to the contrary

in this Deed a person who is not a Party has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce or enjoy the benefit of any term of this Deed." *Id.* at ¶ 1.3(a).

On October 18, 2023, I questioned whether any of the Debtors had a right to assert claims under the Guarantee and Indemnity Agreement in light of these provisions. The Trustee filed a supplemental memorandum of law on October 25, 2023, ECF No. 30, and argued that the Debtor Dean & Deluca, Inc. should be treated as a third-party beneficiary, on the ground that English law permits a third party to enforce a contract term if that term purports to confer a benefit on the third party. *Id.* at 3. However, the Trustee acknowledged that under English law a third party cannot enforce a contract "where on proper construction of the contract it appears that the contracting parties did not intend the third party to have that right." *Id.* at 4.

It is true that the Guarantee and Indemnity Agreement identified Dean & Deluca, Inc. as the party to whom the underlying debt was owed by Grovepark. However, the promise to make payment was a promise that Mr. Techakraisri made to Grovepark (as Beneficiary), not a promise he made to Dean & Deluca, Inc. or to any of the other Debtors. The agreement also expressed, in the clearest possible way, the parties' intent that no third party would have rights to enforce the promise that Mr. Techakraisri had made. I therefore hold that the Debtors have no enforceable claim against Mr. Techakraisri to enforce the terms of the Guarantee and Indemnity agreement.

## IV.    Counts Four and Five – Fiduciary Duty

Counts Four and Five of the Complaint allege that Mr. Techakraisri breached fiduciary duties that he owed to Debtors Dean & Deluca, Inc. ("**D&D**") and D&D International, LLC ("**D&D Int'l**"), each of which was an entity formed and existing under Delaware law. Delaware law imposes a three-year statute of limitations for breach of fiduciary duty claims. Del. Code Ann.

tit. 10, § 8106 (2024).  However, in this case the running of that three-year limitations period was tolled in two different ways.

First, section 108(a) of the Bankruptcy Code provided that if any claim owned by a Debtor was subject to a limitations period, and if such limitations period had not already expired as of the date of the bankruptcy filing, then the debtor or trustee could commence an action before the later of (a) the end of the limitations period, or (2) two years after the order for relief (*i.e.*, two years after the bankruptcy filing).  11 U.S.C. § 108(a).  The bankruptcy petitions in these cases were filed on March 31, 2020.  Accordingly, the statute of limitations for breach of fiduciary claims that accrued on or after March 31, 2017 were tolled, under section 108(a), through and including March 31, 2022.

Second, Mr. Techakraisri agreed, as part of the confirmed Plan, that the statutes of limitations on all claims against him would be tolled through and including the date on which the Creditor Trust gave written notice of the occurrence of a default.  Plan, § IV(F)(7)(e).  The effective date of the Plan was January 28, 2021.  The evidence showed that the Trustee served notice of Mr. Techakraisri's default on January 26, 2022.  That means that the tolling period was just under one year in duration (363 days).

Applying the various tolling provisions under these circumstances is a bit of a headache. The two-year extension of time provided by section 108(a) would have expired on March 31, 2022. The Complaint in this adversary proceeding was not filed until September 1, 2022.  If the two-year period set forth in section 108(a) is itself considered to be a limitations period that was tolled under the Plan, then that two-year period would have been extended by the agreed 363-day tolling period. If that is the case, then the Trustee retained the right on September 1, 2022 to assert claims for

breach of fiduciary duty that accrued on or prior to March 31, 2017 (three years prior to the filing

of the bankruptcy petitions).

If, on the other hand, the tolling provisions of the Plan were interpreted as applying only

to the Delaware three-year statute of limitations – and *not* to the running of the two-year period set

forth in section 108(a) – then the benefits of section 108(a) would have been lost on March 31,

2022.  In that event, the only claims that the Trustee could assert under Delaware law would be

those that arose on or before the date that was 3 years plus 363 days prior to the date of the

Complaint, which would be September 3, 2018.

I believe that the former interpretation is the correct one, and the one that is what the parties

intended through the plan provisions.  Fortunately, however, in light of my review of the asserted

claims it does not appear to matter which of the two possible limitations periods is the correct one.

## A.    The 2014 Loan Obligation

The Trustee alleges that in December 2014 Mr. Techakraisri caused D&D to incur an $80

million obligation to the Siam Commercial Bank ("**SCB**") in connection with the acquisition of

D&D and its affiliates by Pace Development Corporation ("**Pace**").   D&D is a Delaware

corporation, and the three-year statute of limitations as to this claim expired in 2017, well prior to

the bankruptcy filing.  The Trustee did not contend otherwise, and did not suggest that there was

any ground on which the statute of limitations would have been tolled.  The Trustee's only

contention in this regard was that Mr. Techakraisri should be viewed as having waived the statute

of limitations defense by virtue of his default.  For the reasons stated above, I believe in this case

that it is more appropriate to apply the limitations defense where its applicability is plain on the

face of the pleadings.  I therefore conclude that this particular contention does not support the entry

of a judgment against Mr. Techakraisri.

**B.      Use of Pace Loan Proceeds to Repay the SCB Loan**

The Trustee alleges in the Complaint that "[i]n the two years preceding the Petition Date, the Debtors purported to borrow at least $50,936,919.70 from Pace, which they used to pay SCB rather than their rightful creditors." Complaint, at ¶ 55. However, the only asserted basis on which SCB purportedly was not itself a "rightful" creditor was the Trustee's assertion that D&D should not have become obligated on the $80 million loan in 2014. The Trustee conceded that D&D was, in fact, obligated under that loan, and as noted above any claim for breach of fiduciary duty in connection with the incurrence of that obligation is barred by the applicable statute of limitations.

The Complaint alleges that Mr. Techakraisri was a guarantor of the loan to SCB, and therefore that the use of funds to repay SCB (instead of paying other creditors) was of personal benefit to Mr. Techakraisri. But if the debt owed to SCB was actually owed by D&D (as the Trustee admits), it is difficult to understand why the payments to SCB, as opposed to payments to other creditors, resulted in any damage to D&D itself. Furthermore, the Trustee's evidence showed that Pace was itself a guarantor of the SCB loan. Pace itself therefore had a strong incentive to have D&D pay the obligations it owed to SCB and to lend money to D&D for that purpose. There is no allegation in the Complaint that Pace would have loaned the $50,936,919.70 to D&D if those funds were going to be used to pay other creditors instead of being used to satisfy D&D's obligations to SCB, and no evidence was offered to support any allegation that Pace would have been willing to do so. This claim therefore fails.

**C.      The Grovepark Loans and Enforcement of the Same**

In 2015, D&D agreed to make certain loans to Grovepark. As of December 31, 2018, Grovepark owed D&D the principal amount of $4.05 million plus $69,806 in interest, for a total of $4,119,806. The Trustee alleges that the loans to Grovepark were made in violation of fiduciary

duties.  However, the Trustee did not offer clear evidence as to the dates on which the relevant loans were made and as to which loans were made within the relevant limitations period.  More importantly, the Trustee offered insufficient allegations and evidence as to the circumstances surrounding the 2015 agreement to make the loans, and as to the circumstances surrounding the loans themselves, to support a claim for breach of fiduciary duty in connection with the making of the loans.

The Trustee also contends that on February 22, 2019, Mr. Techakraisri caused D&D to assign $2.6 million of D&D's claim against Grovepark to Mr. Techakraisri.  The assignment agreement was submitted to the Court as an exhibit.  The consideration for the assignment allegedly took the form of a debt owed by D&D to Mr. Techakraisri, but the Complaint alleges (and the evidence submitted by the Trustee confirms) that no such loan was owed and that in fact the assignment was made for no consideration.  By virtue of the default that allegation is deemed to have been admitted by Mr. Techakraisri.

In addition, the Trustee alleges that Mr. Techakraisri caused D&D to forego any request for payment, by Grovepark, of the balance of the receivable ($1,479,806) that remained owing to D&D.  Mr. Techakraisri did so to serve his personal interests, since Mr. Techakraisri had promised Grovepark that he would make payment of the debt if payment were demanded by D&D, and since Mr. Techakraisri had agreed to purchase Grovepark.  These allegations of the Complaint were supported by the evidence submitted by the Trustee, and they are deemed to have been admitted by Mr. Techakraisri.

The allegations and evidence offered by the Trustee show that D&D was in significant financial distress in 2018 and subsequently.  The transfer of a portion of the Grovepark receivable to Mr. Techakraisri for no consideration, and the decision not to demand payment from Grovepark

of the balance of the debt (in a matter as to which Mr. Techakraisri's conflicts of interest were apparent), were violations of fiduciary duties that Mr. Techakraisri owed to D&D, for which damages in the principal amount of $4,119,806 are owed by Mr. Techakraisri.

**D.    Royalty and Sub-Licensing Rights with D&D Thailand**

The Trustee alleges that on June 27, 2018, Mr. Techakraisri caused D&D Int'l to enter into an amendment of a license agreement with a non-Debtor affiliate of Pace named Dean & Deluca (Asia) Thailand Co., Ltd. ("**D&D Thailand**").  The agreement was submitted to the Court as an exhibit during the hearing.  In section 1 of the amendment the parties agreed that the royalties payable thereunder by D&D Thailand would be reduced to zero, and that the reduction would be effective as of January 1, 2018.  The Complaint alleges (and the evidence submitted by the Trustee confirms) that the amendment was executed without any consideration to D&D.  By virtue of the default that allegation is deemed to have been admitted by Mr. Techakraisri.

Another amendment was executed by the same parties on July 31, 2018.  That amendment was also submitted to the Court as an exhibit during the hearing.  In that amendment the parties agreed that D&D Thailand would receive the right to sublicense the opening and operation of Dean & Deluca Cafes, Dean & Deluca Markets, and Dean & Deluca Stages in certain areas.  The Complaint alleges (and the evidence submitted by the Trustee confirms) that no consideration was provided for this amendment.  By virtue of the default that allegation is deemed to have been admitted by Mr. Techakraisri.

In addition, on August 13, 2019, Mr. Techakraisri caused D&D Int'l to waive $1,244,671.43 in outstanding royalty obligations owed by D&D Thailand to D&D Int'l. with respect to the period November 1, 2014 to December 31, 2017.  A copy of the waiver (signed by Mr. Techakraisri on behalf of both entities) was submitted to the Court as an exhibit. The

Complaint alleges (and the evidence offered by the Trustee confirms) that the waiver was granted without consideration.

It is not clear whether the allegations about the two 2018 transactions with D&D Thailand would be subject to statute of limitations defenses, for the reasons stated above. It does not matter, however, because the Complaint contains no allegations as to the damages that allegedly were incurred as a result of the forgiveness of royalty obligations after January 2018 or as to the additional rights that were granted without consideration on July 31, 2018. I cannot award (upon a default) damages that are not identified and expressly sought in a Complaint. *See* Fed. R. Bankr. P. 7054, Fed. R. Civ. P. 54(c). Furthermore, no evidence was offered at the hearings as to the values of the rights that were granted to D&D Thailand. I therefore cannot award damages for those two items.

The allegations and evidence offered by the Trustee show that D&D was in significant financial distress in 2018 and subsequently. The forgiveness of royalty payments in August 2019 was plainly within the limitations period. Granting that forgiveness for no consideration was a violation of fiduciary duties that Mr. Techakraisri owed to D&D Int'l. Damages should be awarded for the amount of the royalty payments ($1,244,671.43) that were improperly forgiven.

## E.    Failures to Pursue Chapter 11 Reorganization in 2018-2019

The largest claim that the Creditor Trust has pursued is based on allegations that Mr. Techakraisri ignored the advice of financial advisors who urged the company to file for bankruptcy at various times in 2018 and 2019. The Trustee contends that the debtors should and would have been able to pay all of their creditors if a reorganization or sale had been sought at an earlier time, but that Mr. Techakraisri's delays caused the values of the Debtors' collective assets to degrade.

40

The allegations of the Complaint regarding this contention were thin, to say the least. The Complaint alleged that Emerald Capital Advisors Corp. had repeatedly advised D&D to file for bankruptcy in 2018 and 2019. *See* Complaint, at ¶¶ 35–40, 46. It further alleged that the "delays in implementing a structured process" led to the termination of retail operations and harmed the Debtors' brand (¶ 57), and that if the Debtors' directors had acted responsibly the Debtors could have entered chapter 11 without incurring secured debt. *Id.* at ¶ 58. The Complaint also alleged that Pace had at one contended that the Debtors' intellectual property was worth more than $50 million, but that the Debtors' Disclosure Statement in the chapter 11 cases stated that the value of the intellectual property was only $12 million. *Id.* at ¶ 59. The Complaint then concluded that Mr. Techakraisri had violated fiduciary duties by "[c]ausing the Debtors to refuse, for two years prior to the Petition Date, to implement a structured chapter 11 process to resolve debts and preserve value (including retail operations and intellectual property) for the benefit of the Debtors' creditors, notwithstanding the advice of Emerald that a chapter 11 filing was required to satisfy the Board's fiduciary duties. *See Id.* at ¶¶ 105(i), 117(i).

Nowhere in these allegations is there to be found a specific allegation of an amount of damage purportedly caused by the delays in pursuing chapter 11. Instead, the Complaint alleges generally that "[t]he Debtors were further harmed as a result of Techakraisri's breaches of duty in the amount of more than $25 million in connection with both the incurrence and payment of debts to SCB rather than the Debtors' rightful creditors, the failure to implement a prudent restructuring strategy, and causing the Debtors to encumber and impair their intellectual property." *Id.* at ¶¶ 109, 121. In the absence of a specific allegation regarding the damages caused by the alleged delays in seeking bankruptcy relief, I cannot award damages on this theory.

Even if the lumped damage allegations in the Complaint were sufficient, and even if I were to overlook serious issues as to the relevant limitations period and as to the legal foundations for this particular claim,[5] the Trustee offered no admissible evidence sufficient to support an award of damages, even after I adjourned the hearing to permit the Trustee to gather such evidence. The Trustee offered the Declaration of John Madden of Emerald Advisors, who formerly acted as a financial advisor to D&D and its affiliates. AP ECF No. 32. Mr. Madden stated in his declaration that Emerald had advised D&D in April 2018 that it should pursue a chapter 11 filing or an out-of-court restructuring. He confirmed that the board of directors elected instead to pursue an arrangement by which Pace provided $30 million of added funding. Emerald advised at the time that this would not be sufficient, and it was not. *Id.* at ¶¶ 8–10.

Emerald again recommended a chapter 11 filing in November 2018. Emerald no longer believed that an out-of-court solution was viable, and it believed the company would need an immediate infusion of $9.2 million to meet core obligations in December 2018 and January 2019. *Id.* at ¶¶ 11–12. The board of directors again declined to file for chapter 11 and was unable to raise funds from other sources. *Id.* at ¶ 13.

Mr. Madden stated that in his view "the Company still had considerable realizable value as a going concern at the time of our recommendations over the course of 2018 and January 2019." *Id.* at ¶ 14. He based that view "in part" on a valuation that purportedly had been done by Deloitte in September 2018, which allegedly showed that D&D and its affiliates had an enterprise value of $102 million and that intellectual property represented approximately $50 million of that total

---

[5]    The Trustee relies on a decision by a Hawaii court in *Kane v. PaCap Aviation Finance, LLC*, 652 B.R. 184, 211 (D. Haw. 2023), for the proposition that Delaware courts permit parties to pursue damages on a "deepening insolvency" theory. This suggestion is dubious in light of decisions by the Delaware courts. *See, e.g., Trenwick America Litigation Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168 (Del. Ch. 2006).

value.  *Id.*  However, no such valuation was attached to the Declaration or offered in evidence at the hearing.  Nor did any witness from Deloitte offer testimony.  The purported "opinion" by Deloitte was pure hearsay.

Mr. Madden also testified in person and answered questions that I had about his declaration.  Mr. Madden confirmed that Emerald did not do its own valuation of D&D and its businesses.  He also confirmed that he could not testify as to the basis for any valuation that Deloitte might have done or as to the reasonableness of the methodology that Deloitte had used.  Transcript, AP ECF No. 34, at 11:3-18.

Mr. Madden asserted in his declaration that Emerald had been involved in the "modeling" of a proposed sale process, and that Emerald had "projected several structures and outcomes showing sales proceeds as high as $100,000,000 for the Company's assets, which would have produced a distribution of $14,166,667 to unsecured creditors (assuming that Pace and Siam Commercial Bank were treated *pari passu*."  AP ECF No. 32, at ¶ 15.  When questioned on December 5, 2023, however, Mr. Madden confirmed that these "modeling" calculations were just illustrative.  They were not projections of the sale proceeds that could actually be obtained, or estimates of what the actual values of the Debtors' businesses were.  Transcript, AP ECF No. 34, at 11:3-18.

Mr. Madden compared the schedule of allowed unsecured claims in the Debtor's bankruptcy cases to the account payable records from 2018 and 2019.  He concluded that the Debtors "could have prevented the occurrence of at least approximately $15,380,041 in unsecured liabilities" if they had pursued an earlier bankruptcy filing.  Declaration, AP ECF No. 32, at ¶¶ 21–25.  However, these calculations all depended on the possibility that an earlier filing would have produced a favorable investment or a sale.  Mr. Madden could not identify any party who had

ever been willing to offer an investment or to pursue a sale at a level that would have provided such recoveries. Transcript, AP ECF No. 34, at 13:22-15:24. Nor was he able to offer an actual valuation of what the Debtors' businesses were worth.

The evidence offered by the Trustee was insufficient to sustain the Trustee's damage claim. The evidence of the Deloitte valuation of the debtors' assets as of late 2018 was pure hearsay, and no credible evidence was offered to support the contention that a better outcome was ever attainable.

## V.    Counts Six and Seven – Fraudulent Transfer

Counts six and seven of the Complaint seek to undo the transfer of $2.6 million of the Grovepark receivable to Mr. Techakraisri as a fraudulent transfer. The Trustee alleges, and offered evidence at the hearing to verify, that D&D was insolvent at the time the transfer was made and that D&D did not receive reasonably equivalent value in exchange. The allegations and evidence established a valid claim, and by virtue of his default Mr. Techakraisri also is deemed to have admitted (a) the insolvency of D&D, and (b) the lack of reasonably equivalent value.

The transfer occurred within two years prior to the filing of the bankruptcy petition and therefore is subject to the provisions of section 548 of the Bankruptcy Code. The Complaint was filed on September 1, 2022, which was more than two years after the commencement of the bankruptcy cases. As explained above, however, the parties had agreed in the Plan that the Creditor Trust would defer the filing of an action and that all applicable deadlines would be tolled during that deferral period. That agreement resulted in a deferral period of 363 days. Accordingly, the filing of the Complaint asserting this claim on September 1, 2022 was timely under section 546(a)(1).

Claims six and seven provide an additional basis (in addition to the breach of fiduciary duty theory) for an award of $2.6 million of damages as to the assignment of the receivable to Mr. Techakraisri.

### **Prejudgment Interest**

The Trustee seeks prejudgment interest as to all of the foregoing claims.

**A.      Interest on the Unpaid Plan Obligation**

The Plan, as it was initially confirmed, defined the "Techakraisri Third Payment" as a payment of $750,000 plus interest "accruing from the Effective Date" at the federal judgment rate. The third payment was to be made on or before the date that was one year after the Effective Date. However, the parties agreed to modify these terms after there were some delays in completing the financing that was necessary to make the Plan effective.   Those agreed modifications were incorporated in an Order that I entered on January 4, 2021.  ECF No. 474.  The January 4th order stated:

> Notwithstanding any provision in the Plan or Confirmation Order, the definition of "Techakraisri Third Payment" at Art. I.144 of the Plan shall be deemed to mean "Cash in the amount of $750,000 plus interest accruing from January 1, 2021 at the federal judgment rate, to be paid to the Creditor Trust on or before December 31, 2021."

*Id.* at ¶ 9.  The Trustee contends that the relevant federal judgment interest rate was 0.11%, but that is incorrect; the correct rate as of January 1, 2021 was 0.09%.[6]  Interest on the promised

---

[6]      The federal judgment interest rate changes weekly.  The applicable rate is the one for the week "preceding the date of judgment (or the date interest would otherwise apply)."  *See* https://www.casb.uscourts.gov/sites/casb/files/historic_rates.pdf.  If a judgment is entered on the same date on which a new interest rate is determined, then the correct interest rate is based on "the prior week's release, as the releases are considered to be issued at the close of the business on the date of release." *Id.*  The interest rate computed for the week ending January 1, 2021 was 0.11%, but Mr. Techakraisri's obligation accrued on January 1, 2021, and so the correct interest rate is the one set at the end of the prior week.  The interest rate for the week ending December 25, 2020 was 0.09%. *Id.*

$750,000 payment accrued at the 0.09% federal judgment rate through December 31, 2021, in the total amount of $675.00 (one full year of interest on $750,000 at the rate of 0.09%). The debt therefore was $750,675 at the time of Mr. Techakraisri's default on January 1, 2022.

The Trustee argues that interest from and after the date of Mr. Techakraisri's default should accrue at the much higher New York statutory rate of 9%, rather than at the contractual rate of 0.09%. I expressed some skepticism about this during the hearing, but after further research I have concluded that the Trustee is correct.

The settlement that was incorporated into the plan was a contractual promise by Mr. Techakraisri to make payment. In New York, "where one contracts to pay a principal sum at a certain future time with interest, the interest prior to the maturity of the contract is payable by virtue of the contract;" however, an award of interest following a breach is considered to be a form of damages, and such damages accrue from and after the date of the breach "according to the rate prescribed by the law, and not according to that prescribed in the contract if that be more or less." *O'Brien v. Young*, 95 N.Y. 428, 429–30 (N.Y. 1884); *Marine Midland Bank-Rochester v. Vaeth*, 88 Misc. 2d 657, 660 (Sup. Ct. Monroe Cty. 1976) ("where one contracts to pay a principal sum, with interest, at a certain future time, the 'contract' rate of interest, if any, obtains until the maturity of the principal obligation and the 'legal' interest rate obtains thereafter, whether such be more or less than the contract rate"). A different rule is applied if the contract itself states that interest shall be paid at the contract rate "until payment of the principal." *O'Brien*, 95 N.Y. at 430; *Citibank, N.A. v. Liebowitz*, 110 A.D.2d 615 (App. Div. 1985); *European American Bank v. Peddlers Pond Holding Corp.*, 185 A.D.2d 805, 806 (App. Div. 1992). In such a case, the contract itself makes provision as to the interest that will be owed until payment is made (or until a judgment is entered),

and therefore the contract rate (not the legal rate) is applicable. *Id.* Otherwise, however, the "legal" rate of interest applies following a payment default.

The relevant contract in this case (the Plan, as modified by the agreed January 4, 2021 Order) stated that interest would accrue at the federal judgment rate but also stated that payment would be made on or before December 31, 2021. There was no provision or agreement to the effect that interest would continue to accrue at the federal judgment rate until "payment" was made, even if payment was made after the due date. Mr. Techakraisri's default was a breach of contract, and the Plan makes clear that it is governed by New York law. Under New York law, interest accrued and is awardable at the rate of 9% from "the earliest ascertainable date the cause of action existed." *See* N.Y.C.P.L.R. §§ 5001(a) and (b), 5004(a). Accordingly, interest on the obligation accrued from and after January 1, 2022 at the New York statutory rate of 9%, rather than at the contractual rate of 0.09%.

The debt owed as of the date of default was $750,675, as noted above. Interest on that amount from January 1, 2022 through the date of this Decision, at the rate of 9%, totals $157,333.25. Accordingly, the Trustee is entitled to judgment on Count One in the total amount of $908,008.25.

## B. Interest on Fiduciary Duty Claims

The fiduciary duty claims are governed by Delaware law. Prejudgment interest is awarded in Delaware "as a matter of right and not of judicial discretion." *Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 34 A.3d 482, 485 (Del. 2011) (quoting *Moskowitz v. Mayor and Council of Wilmington*, 391 A.2d 209, 210 (Del. 1978)). Where there is no agreed rate of interest, the legal rate of interest in Delaware is "5% over the Federal Reserve discount rate." Del. Code tit. 6 § 2301(a). Notwithstanding this, the Trustee has only asked for interest on the fiduciary duty

claims at the much lower federal judgment rate that was in effect on the date on which the bankruptcy cases were commenced. The Trustee has also only asked for prejudgment interest from the date of the bankruptcy filings, rather than the dates on which the causes of action for breach of fiduciary duty accrued. These concessions are significantly favorable to Mr. Techakraisri (not prejudicial to him) and so the Court will award prejudgment interest on those claims on the favorable terms proposed by the Trustee.

The federal judgment interest rate on the date of commencement of these cases (March 31, 2020) was 0.17%. *See* https://www.casb.uscourts.gov/sites/casb/files/historic_rates.pdf. The damages for breach of fiduciary duty totaled $5,364,577.43. Interest on that amount from March 31, 2020 through April 30, 2024 is $37,252.99. The Trustee therefore is entitled to judgment on these claims in the total amount of $5,401,730.42. As explained above, however, any amount recovered with respect to the breach of fiduciary duty claims will also reduce the amount owed by Mr. Techakraisri with respect to his obligations under the Plan. An appropriate provision to that effect will be incorporated in the Court's judgment.

## C.    The Fraudulent Transfer Claim

The fraudulent transfer claim, as described above, provided an additional ground on which Mr. Techakraisri is liable for damages for the transfer to himself, without consideration, of a $2.6 million receivable. The claim was asserted under section 548 of the Bankruptcy Code. The ordinary rule is that federal law (not New York law) determines the applicable rate of prejudgment interest with respect to any such claim. *See CNB Int'l, Inc. v. Kelleher (In re CNB Int'l, Inc.)*, 393 B.R. 306, 335–36 (Bankr. W.D.N.Y. 2008). The Trustee contended that I have discretion to award prejudgment interest at higher rates. *See Kittay v. Korff (In re Palermo)*, 739 F.3d 99, 107–8 (2d Cir. 2014) but he has only asked that award interest at the federal judgment rate beginning on the

date of commencement of these cases.  That is considerably less that the interest computation would be if interest were computed from and after the date of the underlying fraudulent transfer, and has the advantage of being the same as the interest calculation on the breach of fiduciary duty claim that provided an alternative theory of recovery for this sum.  I will grant the Trustee's request to award prejudgment interest on this basis.  That claim (standing alone) would have accrued interest of $18,055.40.

### Conclusion

For the foregoing reasons, the Trustee is entitled to the entry of judgment (a) in the amount of $908,008.25 with respect to Count One of the Complaint, (b) in the total amount of $5,401,730.42 with respect to Plaintiff's claims of breach of fiduciary duty, and (c) in the total amount of $2,618,055.40 with respect to Plaintiff's fraudulent transfer claim.  However, the judgments on these claims are overlapping, so that any recovery on any of these amounts must be treated as a recovery and reduction of the other judgments as well.  A judgment is being entered this same day to reflect these rulings.

Dated: New York, New York
      April 30, 2024

                          **s/Michael E. Wiles**
                          Honorable Michael E. Wiles
                          United States Bankruptcy Judge